951 F.2d 1261
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
J. Gerald MCELROY; W.R. Button, Defendants-Appellants.
 Nos. 90-5025, 90-5079.
 United States Court of Appeals, Tenth Circuit.
 Dec. 10, 1991.
 
 Before JOHN P. MOORE and BRORBY, Circuit Judges, and JENKINS,* Chief District Judge.
 ORDER AND JUDGMENT**
 BRORBY, Circuit Judge.
 
 
 1
 In this case, a companion to United States v. Simpson, --- F.2d ---- (No. 90-5032, 10th Cir. Dec. 10, 1991), Mr. McElroy and Mr. Button challenge their convictions of twenty-six criminal charges, including one count of conspiracy, twenty-two counts of aiding and abetting wire fraud, and three counts of misapplication of bank funds. Both assert insufficiency of the evidence, juror misconduct and error in the instructions pertaining to fraud, proof of intent and motive. We affirm.
 
 I.
 Sufficient Evidence
 
 2
 This appeal involves the sufficiency of the evidence concerning whether these defendants knowingly and willingly joined the conspiracy and aided and abetted in the crimes of wire fraud and misapplication of bank funds.
 
 
 3
 There can be no doubt a conspiracy existed to attract depositors' funds to a bank and then wrongfully divert these funds from the bank into the pockets of the participants. Mr. Simpson agreed to sell his controlling interest in the bank to Mr. Phipps. Mr. Phipps agreed to attract brokered deposits to the bank. Mr. Simpson, the bank's CEO, diverted these brokered deposits from the bank's control into Mr. Phipps' checking account. Mr. Phipps then used this money to pay Mr. Simpson far in excess of what his stock was worth and to pay himself. Mr. Phipps also used these funds to pay Mr. Button and Mr. McElroy, together with codefendant Mr. Scarborough and a brokerage firm, exorbitant fees for their services as money brokers in attracting deposits from third persons to the bank.
 
 
 4
 The principal issue we must decide is whether sufficient evidence exists to show Mr. Button and Mr. McElroy knowingly and willingly joined the conspiracy. Appellants have all but conceded they acted in furtherance of the conspiracy and were paid from the diverted funds. However, they strongly argue they acted with ignorance and good faith. They vehemently assert no evidence exists in the record that would show or even tend to show they knowingly and willingly joined the conspiracy.
 
 
 5
 While we have phrased the issue in terms of a conspiracy, Appellants make essentially the same argument concerning their convictions of wire fraud and misapplication of bank funds, i.e., no evidence exists to show they possessed the requisite intent.
 
 
 6
 What then is the evidence tending to show Appellants knowingly participated in the many criminal acts?
 
 
 7
 An essential part of the scheme was to lure funds from unsuspecting depositors to the bank so these funds could be unlawfully diverted into the participants' pockets. The means selected to attract these deposits was the use of money brokers. Money brokers persuade persons to deposit funds into a bank or other financial institution and in turn are paid a commission by the bank, which is normally equal to somewhere between one-fourth of one percent to one and one-fourth percent of the funds deposited through the efforts of the money brokers. The bank typically pays these commissions. Mr. Button and Mr. McElroy fit the description of money brokers. While they are not partners, they share office space and a secretary in Phoenix, Arizona.
 
 
 8
 On January 21, 1986, Mr. McElroy sent Mr. Button to the Fairland, Oklahoma bank with a Declaration of Signature verifying McElroy's signature. January 21 was the date Mr. Simpson and Mr. Phipps commenced their pillage of the bank by executing their "buy-sell" agreement, and also was the day before Phipps opened the checking account into which Mr. Simpson diverted the bank's funds. While at the bank, Mr. Button opened a checking account for J.G.B. Investments in his own name and Mr. McElroy's name. This account was opened with no deposit and no deposits were ever made except from the funds controlled by Mr. Phipps.
 
 
 9
 Mr. Button also executed three documents at Fairland National Bank on January 21, 1986. The first document was entitled "Agreement to Receive Deposit Funds" whereby Mr. Simpson, on behalf of the bank, agreed to receive $15 million as arranged by Mr. McElroy, and agreed to issue Certificates of Deposit (CDs) to each depositor. Mr. Simpson agreed to issue CDs for a five-year term, the interest to float with the "prime rate" and to be paid every sixty days. Mr. McElroy was to receive a line of credit for one year for $900,000 beginning when the first deposits were received. Mr. Button executed this document as attorney in fact for Mr. McElroy. Mr. Phipps gave his written approval to this agreement.
 
 
 10
 The second agreement was entitled "Agreement to Pay Fees." This agreement was similarly signed by Mr. Button and approved by Mr. Phipps. The terms of this agreement called for Mr. McElroy to pay, using his line of credit, "2 points" to Consultants of North America, Inc., and "3 points" to Jim Scarborough with "In-Hand cashiers check(s)." The remaining point of the six percent brokerage commission belonged to Mr. McElroy. This document was also executed by Scarborough and Consultants of North America, Inc.
 
 
 11
 The third document was entitled "Pay Out Instructions." It instructed the bank to wire $20,000 to Consultants of North America, Inc., and $30,000 to Mr. Scarborough for each million dollars of deposits. This document was signed by Button as attorney in fact for Mr. McElroy. It contained Mr. Phipps written approval and bore no further signatories.
 
 
 12
 During the next two days, January 22 and January 23, the bank received by wire $1.2 million from depositors. These monies were transferred by Mr. Simpson's orders into the checking account controlled by Mr. Phipps. On January 23, Mr. Phipps wrote a check on this account for $7,000 and caused it to be deposited in the J.G.B. Investments account. On January 24, the next day, Mr. Button withdrew $6,000 from this account.
 
 
 13
 Mr. McElroy was further linked to Mr. Phipps by telephone records showing numerous calls between Mr. Phipps' and Mr. McElroy's telephones from January 16 through January 28. Mr. McElroy's telephone number was also called from the bank on the evening of January 21, the night before the CD money commenced arriving at the ban. The lights were on in Mr. Simpson's office at that bank during the evening. There were also calls between Mr. McElroy's number and other codefendants.
 
 
 14
 Where there exists a challenge to the sufficiency of the evidence, an appellate court must affirm if record evidence exists that would allow a rational jury to find appellants guilty. The appellate court must look at all the evidence, both direct and circumstantial, giving the government the benefit of all inferences that can reasonably be drawn from this evidence. Concerning the conspiracy charge, the evidence must establish the defendants knowingly and willfully joined the conspiracy. Concerning the aiding and abetting wire fraud charges, the evidence must establish appellants were knowing participants in the scheme to defraud. Concerning the aiding and abetting misapplication of bank funds charges, the evidence must establish an intent to injure or defraud the bank. The requisite intent can be inferred from the circumstances and is basically a question of fact for the jury. United States v. Acree, 466 F.2d 1114, 1117 (10th Cir.1972).
 
 
 15
 Looking at the evidence detailed above, in light of the principles by which we must measure this evidence, we find that money brokers are normally paid less than one and one-fourth percent, but here the money brokers were to be paid six percent. In addition, Mr. McElroy was to receive a $900,000 line of credit from the bank which would be available to him prior to the bank's receipt of all brokered deposits. When we look at the timing of Mr. McElroy's and Mr. Button's actions, we find Mr. Button at the bank opening an account and having agreements signed prior to the day Mr. Phipps opened the checking account into which the bank's funds were diverted. We find the purloined money deposited into this account and withdrawn without the benefit of any relationship to the total amount of monies deposited by their efforts and with no accounting of any type. We find numerous telephone calls linking the defendants. After examining the agreements, the actions of the parties concerning the agreements, and the timing of the parties' actions, we find sufficient circumstantial evidence exists for the jury to find that these defendants knowingly participated in the scheme to defraud Fairland National Bank.
 
 
 16
 The circumstantial evidence does not preclude every reasonable hypothesis of innocence. However, the test for circumstantial evidence is merely whether a rational jury could arrive at its conclusion. A jury is free to choose among reasonable constructions of the evidence. Looking at the total record to determine whether there exists sufficient evidence, we ask if a logical and convincing connection exists between the facts established and the conclusions inferred. In the case before us we find it does.
 
 II
 Juror Misconduct
 
 17
 Both defendants assert error in the trial court's handling of the extraneous information seen by the jurors.
 
 
 18
 Our discussion in Simpson is dispositive. However, Mr. Button asserts he "could have testified in his own behalf" had he known the jury had seen him in handcuffs "since his prior criminal conviction would already have been inferred by the juror." The flaw in Mr. Button's argument is the assumption that a juror knew he was a convicted felon. Even an unsophisticated juror knows a defendant may have to post bail and that some defendants lack the resources to do this. United States v. Halliburton, 870 F.2d 557, 561 (9th Cir.), cert. denied, 492 U.S. 910 (1989). Under these circumstances the emotional impact of the view may not be hostile--it may be quite the reverse.
 
 III
 Instructions
 
 19
 Appellants raised the same issues concerning jury instructions as were raised in Simpson. Our holding in Simpson is dispositive.
 
 
 20
 The judgments of Mr. McElroy and Mr. Button are AFFIRMED.
 
 
 
 *
 The Honorable Bruce S. Jenkins, Chief Judge, United States District Court for the District of Utah, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3